UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GREGORY PICUR, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 14-cv-1492 (KBJ) |
| JOHN KERRY, *Secretary, United States Department of State*, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Gregory Picur served as a Foreign Service criminal investigator for the Office of Inspector General of the United States Agency for International Development ("USAID OIG") from the 1990s until his retirement in May of 2010. The dispute in the instant case concerns the State Department's calculation of Picur's retirement annuity, which Picur alleges is incorrect. (*See* Compl., ECF No. 1, ¶ 14.)[1] Generally speaking, Picur contends that the State Department wrongly based its annuity calculation on what the agency says Picur's salary *should have been* at the time of his retirement, rather than on the compensation that Picur *actually* received. (*See id.* ¶¶ 9–14.) Picur filed an administrative grievance contesting the agency's calculation of his retirement annuity, but the State Department denied his grievance (*see id.* ¶ 4), and on appeal of that denial, the Foreign Service Grievance Board ("FSGB") upheld the agency's calculation (*see id.* ¶¶ 5–8), finding that the State Department had determined Picur's retirement annuity in

---

[1] The United States Department of State administers the retirement payment system in which USAID Foreign Service officers participate. *See* U.S.C. § 4041.

accordance with agency policies (*see, e.g.*, *id*. ¶ 35).  Picur has filed the instant action against Secretary of State John Kerry ("Defendant" or "the Secretary"), asking this Court to review and to set aside the FSGB's conclusion as arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2014).  (*See* Compl. ¶¶ 2, 47–56.)

Before this Court at present is Defendant's motion for summary judgment.  (*See* Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 10, at 7–8.)[2]  Defendant argues that the FSGB's decision should be upheld because the Board examined the relevant evidence and provided a satisfactory explanation for its conclusion.  (*See* Def.'s Mem. in Supp. of Def.'s Mot. ("Def.'s Br."), ECF No. 10, at 22–27.)  But this Court finds that, when it affirmed the State Department's annuity calculation, the FSGB did not consider the crucial issue of whether or not the statutory scheme that governs calculation of Picur's annuity permits the agency to treat the annuity computation process as an opportunity to correct purported prior salary overpayments.  In other words, it is clear to this Court that the FSGB ignored a key aspect of the problem that it was deciding in a manner that rendered its decision to uphold the State Department's annuity calculation arbitrary and capricious in violation of the APA.  Consequently, Defendant's motion for summary judgment must be **DENIED**, the FSGB's decision must be **VACATED**, and the matter must be **REMANDED** for further consideration.

A separate order consistent with this memorandum opinion will follow.

---

[2] Page numbers throughout this memorandum opinion refer to those that the Court's electronic filing system assigns.

**I.     BACKGROUND**[3]

   **A.     Facts**

Picur began working as a criminal investigator for USAID OIG in 1994; he was commissioned as a Foreign Service officer in 1998.  (*See* Mem. from Melinda Chandler, U.S. Dep't of State to Mark S. Johnsen, Exec. Sec'y, FSGB (Jan. 9, 2014) ("Def.'s Suppl. FSGB Mem."), AR at 127.)  Picur served as a Foreign Service criminal investigator with USAID OIG until his retirement in May of 2010.  (*See id.*; *see also* Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n"), ECF No. 12, at 6; Def.'s Br. at 11.)

Picur's career with USAID OIG included postings overseas—for example, Picur states that he was stationed in Egypt in 2006 and in Pakistan from 2009 through his retirement in 2010.  (*See* Ltr. from Nicholas Woodfield to Linda Taglialatela, Deputy Assistant Sec'y for HR, U.S. Dep't of State (Mar. 2, 2012 ) ("Pl.'s Grievance"), AR at 17–18; Ltr. from Nicholas Woodfield to Mark. S. Johnsen, Exec. Sec'y, FSGB (Jan. 23, 2014 ) ("Pl.'s FSGB Rebuttal"), AR at 161; *see also* Pl.'s Opp'n at 6 ("From approximately 1995 to 2010, the USAID paid Picur a salary based on the Foreign Service pay scale because he was stationed overseas for the majority of that time.").)  During the last ten years of his employment, Picur received an annual salary that was comprised of both his base pay amount—*i.e.,* the set figure that corresponds to a Foreign Service employee's Class and Step within the Foreign Service's salary system, *see* 22 U.S.C. §§ 3963, 3966—and also an amount known as a "special differential," which is an additional payment that is provided to certain Foreign Service workers and is calculated as a percentage of that worker's base salary payment.  *See* 22 U.S.C.

---

[3] The facts in this Memorandum Opinion are drawn from the Administrative Record, ECF No. 10-1 ("AR"), and are largely uncontested.

§ 3972(a) (authorizing the agency to pay "special differentials, in addition to compensation otherwise authorized, to Foreign Service officers who are required because of the nature of their assignments to perform additional work on a regular basis in substantial excess of normal requirements").

When Picur retired in 2010, he was eligible to receive annuity payments as a participant in the Foreign Service Retirement and Disability System ("FSRDS"). (*See* Ltr. from Linda Taglialatela, Deputy Assistant Sec'y for HR, U.S. Dep't of State, to Nicholas Woodfield (May 10, 2013) ("Agency Grievance Decision"), AR at 39.) Significantly for present purposes, retirement annuities for Foreign Service criminal investigators are calculated in accordance with the statutory requirements of the Foreign Service Act of 1980, as amended. *See* 28 U.S.C. §§ 4041–4069c-1. The starting point for computing an annuity payment under this statute is section 4046(a)(1), which provides that

> [t]he annuity of a participant shall be equal to 2 percent of his or her average basic salary for the highest 3 consecutive years of service multiplied by the number of years, not exceeding 35, of service credit obtained in accordance with sections 4056 and 4057 of this title[.]

22 U.S.C. § 4046(a)(1). The statute does not define "basic salary" as that term is used in section 4046(a)(1); however, section 4046(a)(8) makes clear that a participant's "basic pay" for annuity calculation purposes includes the special differential pay that Foreign Service officers are authorized to receive. *Id.* § 4046(a)(8). Moreover, section 4046(a)(9) provides that, when determining the average basic salary for the highest 3 consecutive years of service—commonly referred to as the participant's "high three" (*see* Compl. ¶ 13)—"the basic salary or basic pay of any member of the [Foreign] Service whose official duty station is outside the continental United States shall be

4

considered to be the salary or pay that would have been paid to the member had the member's official duty station been Washington, D.C., including locality-based comparability payments[.]" 28 U.S.C. § 4046(a)(9).[4]

In August of 2010—a few months after his retirement—Picur received a letter from the State Department providing him with a "'final' Annuity Calculation." (E-mail from Greg Picur to Amber Hanbury, HR Specialist, U.S. Dep't of State (Sept. 9, 2010), AR at 117.) According to Picur, "the 'high three' amount listed in th[at] calculation [was] substantially less than" the amount that "USAID OIG Human Resources" had told Picur to expect. (*Id.*) Picur began corresponding with officials at the State Department and USAID OIG, inquiring about the details of his high three calculation and the reasons for the unexpected discrepancy. (*See, e.g.*, Email from Bonnie Brown, Retiree Activities Coordinator, Am. Foreign Serv. Ass'n, to Richard A. Crisp, Supervisory HR Specialist, U.S. Dep't of State (Sept. 15, 2010), AR at 114–18.) In an e-mail dated September 10, 2010, on which Picur was copied, a Deputy Director of Human Resources at the State Department explained that the agency had calculated Picur's high three average based on the salary of a "GS-15 Step 10, which is Executive Schedule Level IV, or $155,500" pursuant a pay cap that was established in a memorandum that USAID Inspector General Donald A. Gambatesa issued in March of 2006. (Email from Richard A. Crisp, Supervisory HR Specialist, U.S. Dep't of State, to Joyce Douglas, HR Specialist, USAID OIG (Sept. 10, 2010), AR at 114–15; *see also* Memorandum: Law

---

[4] In its Foreign Affairs Manual ("FAM"), the State Department refers to this aspect of annuity calculation as "virtual locality pay." *See* 3 FAM 6181.2 (2012) ("Virtual locality pay means effective December 29, 2002, [FSRDS] participants . . . who are assigned abroad will be credited the Washington, DC basic pay rate, rather than the overseas basic pay rate for the purpose of retirement annuity calculation.").

5

Enforcement Availability Pay (LEAP) or USAID OIG Commissioned Foreign Serv. Officer Criminal Investigators (Mar. 31, 2006) ("Gambatesa memo"), AR at 8–9.)  The Gambatesa memo, which is addressed to the USAID OIG assistant inspector general for investigations, authorizes special differential pay for USAID OIG Foreign Service criminal investigators.  (*See id.* at 8 (explaining that OIG "will authorize payment of special differential to Commissioned [Foreign Service] criminal investigators at the rate of 18 percent base pay").)  Significantly for present purposes, the memo further states that the "OIG's Acting Legal Counsel . . . has made the determination that special differential is subject to *a bi-weekly pay cap* under the Foreign Affairs Handbook which is similar to the one provided to General Schedule employees" and "[t]herefore, along with granting the increase in special differential, OIG will also implement a bi-weekly pay cap for all [Foreign Service] officers." (*Id.* at 9 (emphasis supplied).)  The Gambatesa memo also expressly adopts a grandfather clause, however; it states specifically that "[e]mployees whose total compensation is above the cap will be allowed to maintain their current total compensation[.]"  (*Id.*)

    The State Department acknowledges that Picur's salary was not, in fact, capped pursuant to the Gambatesa memo at the time that it was paid to him.  (*See* Def.'s Suppl. FSGB Mem., AR at 131.)  Nevertheless, the agency insists that the Gambatesa memo's salary limitations should have applied to Picur and, thus, that his special differential pay from 2006 forward should have been subjected to the biweekly cap such that his overall salary would not have exceeded a GS-15 Step 10 salary level.  (*See id.*)  Thus, for the purpose of calculating Picur's annuity, the agency took the position that Picur actually had received more special differential pay than he was entitled to during the

last few years before his retirement—which erroneously boosted his basic pay for those years—and to avoid perpetuating this alleged overpayment error, the agency's human resources officers imported the purportedly applicable special differential pay cap from the Gambatesa memo when Picur's high three average salary was determined.  (*See* Email from Richard A. Crisp, Supervisory HR Specialist, U.S. Dep't of State, to Joyce Douglas, HR Specialist, USAID OIG (Sept. 10, 2010), AR at 114–15.)

### B.     Procedural History

Picur vehemently disagreed with the State Department's contention that his salary in the years prior to his retirement should have been capped, and he continued to insist that his annuity had been miscalculated in regular correspondence that he maintained with State Department and USAID OIG officials throughout 2010 and into 2011.  (*See, e.g.*, Email from Gregory Picur to Edward Capers, Jr., Deputy Dir., Dep't of State, Bureau of HR (July 21, 2011), AR at 112; *see also* AR at 111–18 (email correspondence).)  On July 29, 2011, Picur emailed Acting USAID Inspector General Robert Ross to explain the problem with his annuity calculation and to request Ross's assistance in clearing up any confusion about Picur's compensation during the last three years of his employment.  (*See* Email from Gregory Picur to Robert Ross, Assistant Inspector Gen., Mgmt., USAID (July 29, 2011), AR at 50.)  On November 21, 2011, Ross sent a letter to the State Department on Picur's behalf, attaching a detailed chart of Picur's actual salary payments and specifically asking the human resources officials who calculate annuities for the State Department "to review the employee's salary history and include the [entire] special differential as part of his basic pay."  (Ltr. from Robert Ross, Assistant Inspector Gen., USAID, to Edward Capers, Jr., Deputy Dir., Bureau of HR, U.S. Dep't of State (Nov. 21, 2011), AR at 53.)  However, the State

Department demurred—in a letter to Ross dated December 6, 2011, the agency expressly "reaffirm[ed its] original calculation of Mr. Picur's annuity[.]" (Ltr. from John K. Naland, Dir., Office of Ret., U.S. Dep't of State, to Robert Ross, Assistant Inspector Gen., Mgmt., USAID, AR at 145.)

Picur then filed a formal grievance with the State Department regarding the agency's retirement annuity calculation, which Picur submitted on March 2, 2012. (*See* Pl.'s Grievance, AR at 17–19). In his grievance, Picur contested the agency's decision to cap the special differential payments he had received (and thus limit his overall basic pay amount) for purposes of calculating his annuity, arguing that the agency was required to base its high three calculation on the amount of pay that Picur *actually* had received, including the full amount of the special differential. (*See id.* at 17–18.) The agency denied Picur's grievance on May 10, 2013, issuing a five-page document that was addressed to Picur's counsel and signed by the Deputy Assistant Secretary for Human Resources. (*See* Agency Grievance Decision at 39–43.) The document asserted that the State Department had properly calculated Picur's "high-3 average" based on "Picur's salary during his last four years of service, including special differential that he received, but only up to the bi-weekly pay cap" announced in the Gambatesa memo. (*Id.* at 41.) The agency further explained that it had determined that Picur did not qualify for the "grandfather provision" in the Gambatesa memo because "[the] grandfather provision [was] for only those employees whose total compensation was above the cap at the time the decision [to impose a cap] was made in 2006[,]" and "Picur's pay, including special differential as of March 31, 2006, was not above the 2006 bi-weekly cap[.]" (*Id.* at 42.)

Picur appealed the State Department's annuity calculation decision to the FSGB in early July of 2013. (*See* Ltr. from Nicholas Woodfield to Chris Wittman, Exec. Sec'y, FSGB (July 5, 2013) ("Pl.'s FSGB Appeal"), AR at 3–6.)  Picur argued that the agency had wrongly "relied on the Gambatesa memorandum to conclude that . . . Picur's total compensation, including his special differential pay, should be capped to the level payable to a GS-15, step 10" for purposes of calculating his retirement annuity (*id.* at 4), and asked the FSGB to "correct his retirement annuity and provide him remedial back pay" (*id.* at 3).  In support of his appeal, Picur argued, *inter alia*, that the State Department had not offered any legal support for its determination that he should have been subject to the bi-weekly pay cap under the Gambatesa memorandum in the first place, emphasizing that no such caps were actually ever implemented with respect to his pay.  (*See id.* at 5 n.2; *see also* Ltr. from Nicholas Woodfield to Chris Wittman, Exec. Sec'y, FSGB (Nov. 5, 2013) ("Pl.'s Suppl. to FSGB Appeal"), AR at 104–06.)  Picur also pointed out that the statute that governs the annuity calculation is silent regarding the application of any limitations on basic pay for the purpose of the calculation.  (*See* Pl.'s FSGB Appeal, AR at 5.)

The FSGB denied Picur's appeal on July 1, 2014.  (*See Picur v. Dep't of State*, FSGB Case No. 2013-031 (July 1, 2014) ("FSGB Decision"), AR at 190–204.)  In its decision, the Board focused on the Gambatesa memo as an expression of agency policy regarding limitations on special differential pay (*see id.* at 197–204) and concluded that, because the agency had reasonably determined that the salary limitation adopted in the Gambatesa memo should have applied to Picur—even though it was undisputed that no caps were ever actually enforced with respect to Picur's pay prior to his retirement

(*see id.* at 194, 195, 200)—the State Department had calculated Picur's retirement annuity reasonably and in accordance "with existing OIG policy, and compliant with the Gambatesa memo[.]" (*Id.* at 203–04.)

Picur filed the instant action seeking judicial review of the FSGB's decision on August 29, 2014. (*See* Compl.) *See also* 22 U.S.C. § 4140 (providing for judicial review of FSGB decisions in federal district court under the APA standard of review). Picur's one-count complaint alleges that the FSGB's denial of his administrative appeal was "arbitrary, capricious, and an abuse of discretion" under the APA because "[t]he FSGB did not examine all relevant evidence, provide a satisfactory explanation for its conclusions, or show a rational connection between the facts and the choices made[.]" (Compl. ¶¶ 50, 51). Defendant filed the pending motion for summary judgment on January 7, 2015, asserting that the agency is entitled to judgment as a matter of law because the FSGB considered all relevant factual evidence (*see* Def.'s Mot. at 22–25) and provided satisfactory explanations for its decision (*see id.* at 25–27). In response, Picur maintains that Foreign Service officers are exempt from pay caps of the type that the Gambatesa memo purportedly imposed (*see* Pl.'s Opp'n at 15–16), and that, in any event, Picur qualified for the Gambatesa memo's grandfather provision (*see id.* at 7).

This Court held a motion hearing on July 7, 2015, and took Defendant's motion for summary judgment under advisement.

## II. LEGAL STANDARD

Summary judgment is the appropriate procedural mechanism for resolving challenges to final agency actions under the Administrative Procedure Act. *See Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing *Stuttering Found. of Am. v. Springer*, 498 F.Supp.2d 203, 207 (D.D.C.2007)), *aff'd*, 408

10

F. App'x. 383 (D.C. Cir. 2010); *see also Richards v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977). In most civil cases, courts grant summary judgment in a movant's favor "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); however, "because of the limited role of a court in reviewing [an] administrative record[,]" the typical Rule 56 summary judgment standards do not apply in an APA case. *Stuttering Found. of Am.*, 498 F. Supp. 2d at 207. Instead, unless a particular statute provides otherwise, courts review final agency actions (including decisions of the FSGB) using the standard of review set forth in section 706 of the APA, which requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *see also* 22 U.S.C. § 4140 (final FSGB decisions are subject to judicial review in federal district court pursuant to section 706 of the APA); *Olsen v. Albright*, 990 F. Supp. 31, 36 (D.D.C. 1997) (same).

The APA standard of review is narrow in the sense that a court may not "substitute its judgment for that of the agency," but the standard is also probing insofar as a reviewing court must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). This assessment includes determining "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error

11

of judgment." *Id.* (internal quotation marks and citation omitted). Thus, an agency action will be deemed arbitrary and capricious within the meaning of the APA if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*; *see also Olsen*, 990 F. Supp. at 36.

### III. ANALYSIS

As explained, the FSGB upheld the State Department's annuity calculation because the Board concluded that the agency had reasonably determined that Picur's actual "high three" salary amount was erroneously inflated at the time is was paid—*i.e.*, that Picur had been overpaid prior to his retirement because the special differential portion of his basic pay should have been (but was not) capped pursuant to the Gambatesa memo—and had rationally adjusted his annuity calculation accordingly. (*See* FSGB Decision, AR at 197–204; *see also id.* at 202 ("Grievant cannot now claim that he is somehow entitled to receive an annuity based on compensation he was not entitled to receive when he was employed as a criminal investigator.").) In reaching this conclusion, the FSGB focused on whether Picur's salary should have been subject to the biweekly pay cap per the Gambatesa memo as a matter of agency policy (*see id.* at 203–204) and made no mention of a significant threshold concern: that even if the State Department was correct that Picur previously received a higher basic pay amount than he was entitled to, the agency may nevertheless lack the statutory authority to adjust the high three salary variable downward when calculating an annuity payment. This Court concludes that the FSGB's failure to evaluate the extent of the agency's

statutory authority rendered its ruling upholding the annuity calculation arbitrary and capricious for the following two reasons.

First of all, it is clear beyond cavil that Executive Branch agencies must be statutorily authorized to act. The State Department's authorization with respect to annuity calculations appears in section 4046 of Title 22 of the United States Code, and nothing in that statutory section plainly permits the agency to make the kind of adjustment to the annuity calculation that is at issue here—the operative provision states only that "[t]he annuity of a participant *shall* be equal to 2 percent of his or her *average basic salary for the highest 3 consecutive years of service* multiplied by the number of years, not exceeding 35, of service credit obtained in accordance with sections 4056 and 4057 of this title[.]" 22 U.S.C. § 4046(a) (emphasis added). By its plain terms, this provision clearly indicates that Congress intended for the State Department to base the high three average on the annuitant's actual basic salary as a historical fact, rather than on what the agency believes (in retrospect) the annuitant *should* have been paid, and indeed, the statute does not appear to confer to the agency any discretion whatsoever with respect to adjusting the figures that are to be plugged into the annuity variables. Moreover, this narrow reading of the agency's annuity authorization is consistent with other provisions of the annuity statute—it appears that Congress has specified only one instance in which the agency can import hypothetical figures regarding an prior annuitant's salary, and that situation involves permitting the agency to replace the actual salary the annuitant received with a *sum certain*, *see, e.g.*, 22 U.S.C. § 4046(a)(9) (providing that "[f]or purposes of . . . annuity computation . . . the basic salary or basic pay" of a participant stationed overseas "shall be considered to

13

be the salary or pay that would have been paid to the member had the member's official duty station been Washington, D.C., including locality-based comparability payments"); the agency is not thereby authorized to base the annuity calculation on its own freestanding determination about unexecuted limitations on the participant's prior salary, much less to make a unilateral decision that resolves a dispute about whether the participant was previously overpaid.

  Second, while Defendant is surely correct that Congress must have intended for the "high three" salary average upon which an annuity is based to be accurate (*see* Mot. Hr'g Tr., July 7, 2015, at 23:16–24:5), this observation does not lead inexorably to the conclusion that Congress intended for *the annuity calculation* to be the context in which the State Department evaluates, and resolves, alleged errors regarding prior salary payments. There are other well-established mechanisms for adjudicating and recouping salary overpayments (*see, e.g.*, *id.* at 45:12–19 (discussing DFAS collection procedures)), and it is certainly conceivable that the statutory scheme requires the State Department to use such mechanisms to address the purported overpayment of an annuitant's prior salary and to recalculate the annuity amount only if the basic salary has been so adjusted (*i.e.*, there is nothing in the annuity statute that prohibits the agency from revisiting its initial annuity determination if a corrected basic salary determination is made pursuant such other proceedings). Put another way, the statutory scheme that Congress has adopted to govern annuity computations is quite specific regarding how the State Department is supposed to calculate annuities, and while certain other adjustments are addressed, the statute neither expressly nor implicitly authorizes the agency to adjust the " high three" variable downward if the agency

discovers a problem with the salary payments that were actually previously made, which suggests that Congress may not have intended for overpayment problems to be considered and addressed in the annuity calculation context. *Cf. United States v. Clarke*, 628 F. Supp. 2d 1, 9 (D.D.C. 2009) (finding that, where Congress has established by statute the process for determining the validity of citizenship, the court was without authority to invalidate a naturalization order in the context of a criminal proceeding), *aff'd sub nom. United States v. Straker*, --- F.3d. --- , 2015 WL 5099548 (D.C. Cir. Sept. 1, 2015).

Whatever the appropriate statutory analysis, the administrative record in this case makes crystal clear that the FSGB failed to consult *any* of the statutory provisions that specifically prescribe how an annuity is properly calculated in this context, and it appears to have merely assumed that the State Department has the power to decide that an annuitant's actual high three salary average is too high for the purpose of an annuity calculation. Consequently, this Court concludes that the Board failed to consider an important aspect of the problem with which it was presented, and thus its decision was arbitrary and capricious for the purpose of the APA. *See, e.g., Olsen*, 990 F. Supp. at 40 (granting summary judgment for plaintiff where the FSGB "did not properly consider the legality of the [agency's] policies"); *see also Quantum Enterm't, Ltd. v. U.S. Dep't of Interior, Bureau of Indian Affairs*, 597 F. Supp. 2d 146, 153 (D.D.C. 2009) (holding that where an agency's "decision [i]s incomplete, [it] violates the prohibition against arbitrary or capricious agency decisions" (citation omitted)).

## IV. CONCLUSION

This Court finds that, when the FSGB upheld the annuity calculation at issue here, it ignored the distinct possibility that, regardless of the Gambatesa memo and the

15

agency's purported policy regarding the amount of basic pay that Picur should have received during his last few years of employment, the State Department does not have the statutory authority to import an unexecuted salary cap, or otherwise adjust a participant's high three salary average, when it undertakes to calculate a participant's annuity.  Therefore, as set forth in the accompanying order, Defendant's motion for summary judgment will be **DENIED**; the FSGB's decision will be **VACATED**; and this matter will be **REMANDED** to the FSGB for further proceedings consistent with this memorandum opinion.

DATE:  September 11, 2015          *Ketanji Brown Jackson*
                KETANJI BROWN JACKSON
                United States District Judge